# EXHIBIT 1



**MARTINELLI & ASSOCIATES**
JUSTICE & FORENSIC CONSULTANTS, INC.

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

## DR. JOHANNES MARKUS SIEBER and MINA MARGARETHA SIEBER-SCHNEITER,
## Plaintiffs,

## v.

## DELTA AIR LINES, INC., ET AL,

## Defendants

## Case No: 2:17-CV-13024

### Report of Plaintiffs' Police Practices Expert, Ron Martinelli, Ph.D.

I have been retained by *Jackson Law International , and attorneys Bonnie J. Jackson, Esq., and Michael R. Jackson, Esq.,* as an expert witness in the above civil action. I am therefore submitting the following information in support of the opinions and conclusions expressed in this report.

I have spent over twenty-two years as an active police officer and detective. I have held assignments as a uniformed patrol officer, tactical patrol officer, Senior Field Training Officer, and as a patrol supervisor. My detective assignments include crimes against persons and property, sexual assaults, gang investigations, and fraud and complex thefts. I was an undercover officer for three and one-half years where I was assigned in anti-crime assignments as a robbery and prostitution decoy officer.

As a uniformed officer, I was involved in hundreds of high-risk encounters with violent individuals, including scores of encounters involving subjects under the influence of dangerous drugs; those experiencing acute, serious mental disorders and those presenting with extended and sudden psycho-medical emergencies such as agitated-chaotic events and excited delirium syndrome.

I have instructed officer safety, de-escalation, electronic control weapons, impact weapons, arrest, control and restraint tactics and responses to psycho-medical emergencies including subjects experiencing agitated-chaotic events to thousands of officers nationally. I have also authored peer reviewed research and articles on these subjects within the law enforcement and forensic communities.

I possess a doctorate degree (Ph.D.) in Criminology with emphasis in forensic psychology, accredited by the offices of the U.S. Department of Education and the California Superintendent of Public Instruction. I possess a Master's degree in Public

Administration with emphasis in Justice Administration (MPA/JA) and a specialization in municipal government consulting. I hold a bachelor's degree in physical education with emphasis in pre-medical sciences and exercise physiology.

I am a former adjunct professor of Forensic Science at National University – San Diego where I instruct in the university's Master's in Forensic Science program. I am a former adjunct professor of Forensic Psychology at Argosy University – San Francisco and a former adjunct professor of Criminology at California Polytechnic State University, San Luis Obispo. Since 1978, I have also been a credentialed instructor or adjunct professor of law enforcement, police practices, forensics, and the administration of justice at numerous accredited universities and colleges in California, Nevada and Louisiana.

I am Board Certified in Forensic (Psychological/Emotional) Trauma by the American Academy of Experts in Traumatic Stress – National Center for Crisis Management, where I also hold Diplomate Status. This certification indicates specific expertise in the areas of stress-induced incidents, and psychological/emotional trauma and psycho-physiological responses to intense stress events. My specific areas of expertise in forensic trauma are mental health disorders, psycho-medical emergencies, human factors, psychophysiology, and performance under intense stress.

I have been a member in good standing with the former American College of Forensic Examiners Institute (ACFEI), where I have presented nationally as an expert in police practices, forensics, crime scene analysis, force investigations and forensic force analysis. I am a Certified Medical Investigator (CMI-V) at the physician's level, accredited by ACFEI. I have chaired ACFEI's Medical Investigator Board of physicians, nurses and forensic investigators.

I am certified as a Force Analyst through the Force Science Training Institute®. The primary field of research and curriculum at the Force Science Institute® is the analysis of crime scenes and forensic evidence relating to officer-involved shootings, in-custody deaths and human factors involved in major uses of force.

I am a Certified Force Investigator with specialization in officer-involved shootings and in-custody deaths through the Los Angeles Police Department's Force Investigations Division. The majority of my forensic education through LAPD's Force Investigations Division was crime scene management, evidence identification, recovery and forensic analysis.

I am a Certified Litigation Specialist in police and corrections litigation through Americans for Effective Law Enforcement (AELE) which is the largest law enforcement amicus curie litigation defense organization in the nation. I periodically participate in this professional organization by attending courses in police practices, corrections, investigations, internal affairs, forensics and civil rights laws pertaining to law enforcement encounters with the public.

I currently am retained as a law enforcement practices and forensic expert for the U.S. Attorney General's Department of Justice. I have been retained as a police practices and forensic expert for the States Attorney General's Offices of Alaska, Oregon, Nevada, New Mexico, Nebraska, West Virginia, Illinois, Delaware; the Cities of Los Angeles (CA), Long Beach, (CA), San Jose (CA), Sacramento (CA), Albuquerque (NM), Denver (CO), Colorado Springs (CO), Salt Lake City (UT), Miami Beach (FL), North

Miami Beach (FL), Cleveland and Columbus (OH), Richmond (VA), Portland (OR), Schenectady (NY); and numerous other municipalities in California and Illinois.

I am currently a retained law enforcement and forensic expert for the U.S. Navy Department and the United States Marine Corps Judge Advocate General's Offices, Western District.

I am currently a retained law enforcement practices and forensic expert for the Combined Law Enforcement Associations of Texas (CLEAT) and have been a law enforcement practices and forensic expert for the Peace Officer's Research Association of California.

I am currently and have been a retained civil rights and forensic police practices expert to several nationally recognized private law firms specializing in civil rights and police practices litigation representing plaintiffs and defendant agencies.

I am a former retained independent Special Investigator for the City of Riverside (CA) Police Community Review Commission and review officer-involved shootings and in-custody deaths for this civilian body through the Office of Mayor. I am a forensic police practices, self-defense, use of force and deadly force expert for the County District Attorneys' Offices of Riverside, Santa Clara and Modoc County (CA).

As a law enforcement officer and investigator, I have personally investigated, and/or supervised over three hundred (300) complex officer-involved crime scenes, recovering and documenting evidence from them.

To date as a forensic criminologist, I have personally investigated, reviewed, analyzed, documented evidence, and consulted on and/or testified in nearly four hundred (400) major uses of force including nearly two hundred (200) complex officer and citizen involved shootings and in-custody deaths.

I am a former director of a California Commission on Peace Officer Standards & Training (POST) police and corrections academy, where I also served as Division Dean of Criminal Justice and Law Enforcement. In this position I administrated over, supervised, and evaluated a staff of over one hundred tenured and adjunct law enforcement faculty who instructed police/corrections practices. As director, I was also involved in developing training methodologies relating to contemporary police practices and defensive force including firearms and deadly force decision making.

Since 1980, I have been approved as an instructor or training provider by the states of California, Nevada, Arizona, Wyoming, Ohio, Wisconsin, Missouri and Delaware Commissions on Peace Officer Standards & Training (P.O.S.T.); as well as the Texas Commission on Law Enforcement (TCOLE).

I have been an approved law enforcement and corrections instructor for the California Board of Corrections from 1978 – 2007. In this capacity, I have served as an instructor in the areas of police practices, tactical negotiation/conflict resolution, laws of arrest, search and seizure, supervisor and officer responses to critical incidents, mental health disorders, use of force, officer safety tactics, Arrest & Control Tactics, chemical agents, electronic control weapons (ECW) – TASER®, Unarmed Defensive Tactics, impact weapons and less lethal munitions; firearms instruction, criminal investigations, the investigation of violent crimes including shootings; "Suicide by Cop," psychological profiling, the psychology of criminal behavior, the body's psycho-

physiological responses to stress-induced circumstances; and the investigation of officer-involved and civilian self-defense shootings.

I am a member in good standing of the International Law Enforcement Educators and Trainers Association (ILEETA) and have presented to national and international law enforcement audiences on de-escalation, defensive tactics, use of force investigations, and the forensic analysis of evidence. I have been a member of the International Association of Chiefs of Police (IACP). I am currently active in numerous professional law enforcement, forensic, and medical associations.

As a police officer, detective, law enforcement, and municipal government trainer and consultant, I have consulted with over three hundred law enforcement and criminal justice agencies and specialized military units. I have personally trained over 80,000 peace officers and military personnel in my certified areas of instruction.

I am the author of five texts, nearly forty training manuals, and numerous peer reviewed, published articles about police practices, criminal investigations, forensics and independent review of police-involved force incidents.

Specific to this case analysis, I have written extensively and trained thousands of law enforcement officers, attorneys and criminal justice professionals on the subjects of laws of arrest, search & seizure, de-escalation, use of force, Arrest & Control Tactics (ACT®) and handcuffing. I am also certified as a Master Instructor in de-escalation and Arrest, Control and Handcuffing Tactics. I have personally taught over 200 law enforcement courses on laws of arrest and search & seizure. I have personally taught over 300 courses in de-escalation; and approximately 400 classes in physical control techniques including Arrest, Control and Handcuffing Tactics. I am also a court qualified expert in premises liability and security issues.

I have consulted with and/or trained numerous county, state and federal prosecutors, Assistant State Attorney Generals, Superior Court judges and various professional training organizations including the California District Attorneys Association (CDAA) and the Center for Judicial Research & Education. I remain an active trainer and consultant within my areas of expertise.

As a forensic criminologist, law enforcement, municipal government trainer and consultant, and a Federal/State Courts qualified police/corrections practices expert since 1993, I have been retained by county counsels, city attorneys, plaintiff's attorneys, prosecutors, criminal defense attorneys, and a state attorney general's office in over two hundred-fifty Federal and State Court cases.

I have been deposed and have testified in numerous federal and state civil and criminal actions; and have been designated by Federal and State Superior Court judges as a qualified authority in police practices, laws of arrest, search and seizure, traffic enforcement, suicidality, criminal investigations, crime scene investigations, video analysis/interpretation, forensics, officer safety tactics, use of force/excessive force at all force levels including TASER® electronic control weapons (ECW); officer-involved shootings; alcohol and narcotics influence; human factors and psycho-physiological responses to stress-induced circumstances. I have also been qualified in both Federal and State Courts to render findings and opinions on the subjects of hiring, supervision, training, police practices negligence, internal affairs investigations, law enforcement liability and deliberate indifference.

*Rule 26b Report, Ron Martinelli, Ph.D.*
*Sieber v. Delta Air Lines, et. al, Case #USDC 2:17-CV-13024*

To date, I have been retained by defendant law enforcement and municipal agencies in approximately sixty-two percent (62%) of my cases, and have been retained by plaintiffs, prosecutors and/or as a court appointed expert in approximately thirty-eight percent (38%) of my retained cases.

My fee schedule is as follows: a $5,000.00 non-refundable retainer to accept and commence work on a case; $400/hour for attorney consultation, testimony at deposition or while in court, and $300/hour for report review and report writing. My expedited report writing fee is $400/hour. Clients are billed by the quarter-hour. My daily consultation or court appearance rate is $3,200/day and my deposition fee is $2,000 for a minimum of four hours of testimony. All other fees for services rendered, travel and per diem are listed in our firm's standard Services Agreement which is provided to all attorney clients.

The information and accompanying documents I have provided to the Court are truthful and accurate to the best of my knowledge and I pray that the Court will find that my professional experience, expertise and education are sufficient to be designated as an expert in this matter.

Signed _____ Date: 08-12-19

Ron Martinelli, Ph.D., CMI-V

Forensic Criminologist/Law Enforcement Training Consultant

Federal/State Courts Qualified Law Enforcement Practices/Forensic Expert

Certified Medical Investigator

## DOCUMENTS REVIEWED FOR THIS ANALYSIS

Commencing in August, 2019, the plaintiffs' counsel Bonnie J. Jackson, Esq., presented me with evidentiary documents for my review in preparation for opining on this case and requested that I prepare a concise declaration outlining my basic opinions in this case. Those findings and opinions to date have been incorporated into this document.

As is usually the case in investigations such as this, I am aware that there may be additional documents or other evidence that might subsequently become available during the discovery process that I might wish to review which may assist me in developing more detailed findings and opinions. Therefore, I reserve the right to amend my findings and opinions at some later date based upon my ability to review any additional records and/or items of evidence I might subsequently receive.

1. Court Document: Second Amended Complaint – 2:17-cv-13024
2. Court Document: Counselors encl Second Supp Rule 26 disc
3. Court Document: Delta &  Weems Initial Disclosures

6

4.  Court Document: Delta D's Second Suppl. & Amended Initial Disclosures
5.  Court Document: Delta D's Suppl. & Amended Initial Disclosures
6.  Court Document: Delta D's Third Suppl. & Amended  Initial Disclosures
7.  Court Document: Delta Weems Suppl. & Amended  Initial Disclosures
8.  Court Document: Deltas Amended Answers to FROGS - 05.08.19
9.  Court Document: Deltas Answers to FROGS - 04.30.19
10. Court Document: Deltas Second Amended Responses to FROGS - 06.14.2019
11. Court Document: FROGS to Delta - 03.27.19
12. Court Document: JPSO Rule 26 Initial Disclosures
13. Court Document: JPSO Rule 26 Second Suppl. Disclosures
14. Court Document: JPSO Rule 26 Supplemental Initial Disclosures
15. Records: DELTA 00001-00003 Crime Report
16. Records: Deputy Harris, Erroll 08082019
17. Records: Credit Card Statement, Cembra, 12.23.2016
18. Records: Ps Production Bates No. Sieber001-038
19. Records: Ps Production Bates No. Sieber039-044
20. Records: Ps Production Bates No. Sieber045-049
21. Records: Paul D. Connick, Jr. 05.28.19
22. Correspondence: Email Correspondence from Delta to Dr. Sieber
23. Correspondence: Letter from Dr. Sieber to the Inspector General- State of LA
24. Correspondence: Letter from Dr. Sieber to the New Orleans Airport
25. Correspondence: Letters from Dr. Sieber to Delta
26. Depositions: Deputy Steer, Jesse 08082019 & Exhibits
27. Depositions: Deputy Harris, Erroll 08082019 & Exhibits
28. Depositions: Sieber - Depo Transcript 7.11.2019
29. Photos: FB Erroll Harris 05.22.2016
30. Photos: FB Jesse Steer Jr_08.14.2016
31. Photos: Photo Erroll Harris FB 12.09.2017
32. Photos: Post of Harris first day at JPSO
33. Court Document: Complaint #UDSC 2:17-CV-13024
34. Deposition – Deputy Jesse Steer, 08-08-19
35. Deposition – Deputy Erroll Harris, 08-08-19
36. Statute – LA RS §14:36, Assault Defined
37. Statute – LA RS §14:33, Battery Defined
38. Statute – LA RS §14:35, Simple Battery
39. Statute – LA RS §14:63.3 – Entry On or Remaining In Places or On Land After Being Forbidden
40. Statute – LA RS §14:108, Resisting An Officer
41. Statute – LA Code of Criminal Procedure, CCRP §213, Arrest by Officer without Warrant when Lawful
42. Case Law: State v. Fauria, 393 So. 2d 688, 690 (La. 1991), PC
43. Case Law: Beck v. Ohio, 379 U.S. 89 (1964), PC
44. Case Law: State v. Simms, 571 So. 2d 145, 148 (La. 1990), PC
45. Case Law: State v. Allen, 95-1754 (La. 4 9/5/96); 682 So. 2d 713, Arrest
46. Case Law: . State v. Moreno, 619 So. 2d 62, 65 (La. 1993)(citing United States v. Mendenhall, 446 U.S. 544, 554 (1980)).
47. Case Law: Graham v. Connor, 490 U.S. 386, 396-97, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989) - UOF

48. Case Law: Saucier v. Katz, 533 U.S. 194, 201 (2001) - UOF
49. Case Law: Forrester v. City of San Diego, 25 F.3d 804 (9th Cir. 1994) - UOF
50. Case Law: Tennessee v. Garner, 471 U.S. 1 (1985) – UOF/Warnings
51. Case Law: Forrett v. Richardson, 112 F.3d 416 (9th Cir. 1997) – UOF
52. Case Law: Deering v. Reich, 183 F.3d 645, 652-53 (7th Cir. 1999) – UOF
53. Case Law: Collins v. Nagle, 892 F.2d 489, 493 (6th Cir. 1989) – UOF
54. Case Law: Glenn v. Washington, 673 F.3d 864, 871 (9th Cir. 2011)
55. Case Law: Wall v. County of Orange, 364 F.3d 1107, 1109-12 (9th Cir. 2004) – UOF/Handcuffs
56. Case Law: LaLonde v. County of Riverside, 204 F.3d 947, 952, 960 (9th Cir.2000) – UOF/Handcuffs
57. Case Law: Palmer v. Sanderson, 9 F.3d 1433, 1434-36 (9th Cir. 1993) – UOF/Handcuffs
58. Case Law: Hupp v. City of Walnut Creek, 389 F.Supp.2d 1229, 1232-33 (N.D. Cal. 2005) – UOF/Handcuffs
59. Case Law: Sokolaw (1989) 490 U.S. 1, 7-8 - Detention
60.      Case Law: Tony C. (1978) 21 Cal. 3d 888, 893 - Detention
61. Case Law: Twilley (9th Cir. 2000) 222 F. 3d 1092, 1095 - Detention
62. Case Law: Andre P., (1991) 226 Cal. App. 3d 1164, 1169 – Detention
63. Case Law: Hodari D. (1991) 499 U.S. 621, 627-628 – Detention
64. Case Law: Wardlow (2000) 528 U.S. 119 – RS/Detention
65. Case Law: White (1990) 496 U.S. 325, 330 – RS/Detention
66. Case Law: Mims (1992) 9 Cal.App 4th 1244, 1248 – Special Knowledge/Detain
67. Case Law: Hensley (1985) 469 U.S. 221 – Detention – Knowledge from Others
68. Manual: *Concepts of Criminal Law, Laws of Arrest, Search & Seizure*, Ron Martinelli, Ph.D., © 2005, 2011, Martinelli & Associates: Justice Consultants, LLC
69. Manual: *Tactical Psychology & Physiology*, Ron Martinelli, Ph.D., 2007, Martinelli & Associates: Justice & Forensic Consultants, Inc.
70. Manual: *De-escalation Tactics for Instructors and End Users*, Martinelli, Ron, Ph.D., © 2017, Martinelli & Associates, Justice & Forensic Consultants, Inc.; 2019 ETCforensic
71. Manual: *Arrest, Control and Restraint Tactics,* Martinelli, Ron, Ph.D., © 1994 – 2012, Martinelli & Associates: Justice & Forensic Consultants, Inc.
72. Manual: *Use of Force*, Martinelli, Ron, Ph.D., © 2019, ETCforensic
73. Text: *Use of Force Investigations*, Davis, Kevin, R., © 2012, Responder Media, Bloomington, IN
74. Text: *Processing Under Pressure: Stress, Memory and Decision Making in Law Enforcement*, Sharps, Matthew, Ph.D., © 2010, Loose Leaf Publishing, Flushing, N.Y.

**DETAILS OF INCIDENT**

On 11-21-16, the plaintiffs identified as Dr. Johannes Sieber (hereafter referred to as Dr. Sieber) and his wife Mina Margaretha Sieber – Schneiter (hereafter referred to as Mrs. Sieber) had paid for and were on Delta Airlines flight DL#696, traveling from Louis Armstrong International Airport in New Orleans to New York City.

8

While on the aircraft which had not yet left Concourse D, Gate D-6, Dr. Sieber was apparently placing his wife's carry-on bag up and into an overhead bin compartment near their seats. During this process, Dr. Siebert apparently dislodged an open bag filled with a number of small plastic wrapped packets. The packets apparently fell out of the open bag and onto the aisle. No passengers were struck by these falling objects.

The discovery evidence, which is vague, uncertain and incomplete indicates that Dr. Sieber attempted to pick up these small packets and replace them back into the open bag unassisted by any member of the flight crew. Dr. Sieber states that upon completion of this task, he returned to his seat in Row 21. (Dep. Dr. Sieber, pp. 64:8-12; 65-68; 69-72)

Dr. Sieber states that momentarily, he was approached by a female flight attendant who told him to get the couple's luggage because they had to leave the aircraft. He states that the couple were not informed as to why they had to leave the aircraft and refused to leave. (Dep. Dr. Sieber, pp. 85:10 – 86:23)

The discovery evidence including statements of the involved parties documents Jefferson Parish Sheriff Department Reserve Deputies Jesse Steer and Erroll Harris received a radio call for service by the airport authority (AVCOM) to respond to Concourse D, Gate D-6 in regard to an alleged "irate passenger." Dep. Steer is identified as the primary officer and Dep. Harris was there to assist Dep. Steer.

Upon the arrival of the deputies, they determined that the passenger was on the aircraft identified as Delta Flight DL#696. The evidence documents that Dep. Steer initially spoke with Delta flight attendant Dominic Morales on the gangway proximate to the front door of the aircraft. Dep. Steer states that Morales advised him that the flight crew wanted a passenger removed from the aircraft. Dep. Harris states that he did not overhear this conversation.

The deputies state that they boarded the aircraft. A member of the flight crew identified as flight attendant Katherine Weems (hereafter identified as "Weems") led the deputies to Dr. Sieber who was seated in Row 21, with Mrs. Sieber seated next to him. Dep. Steer, whose testimony is in uncertain and conflicting, states that Weems either told him that Dr. Sieber had struck her with his carry-on luggage; or that the doctor had struck another unknown member of the flight crew with his luggage. Dep. Steer's testimony indicates that either Weems or Morales instructed the deputies to remove Dr. Steer from the aircraft. Dep. Harris states that he did not hear any conversation between Weems and Dep. Steer. Both deputies state that they never heard Weems, nor any other member of the flight crew inform Dr. Sieber as to why he had to leave the aircraft.

Deputies Steer and Harris state that they approached Dr. and Mrs. Sieber. They state that when they first observed and encountered the pair, neither was loud or disruptive. They state that no passengers complained about the couple creating a disturbance. Dep. Steer states that he spoke with Dr. Sieber and informed him that he would have to leave the aircraft. The deputies state that neither of them ever informed Dr. Sieber or his

9

wife as to why Dr. Sieber had to leave the aircraft even though Dr. Sieber asked them why he had to leave.

Deputies Steer and Harris state and the evidence indicates that at one point in the encounter after the deputy(s) threatened Dr. Sieber with arrest if he did not vacate the aircraft, Dr. Sieber got up from his seat to leave the aircraft in the company of Deps. Steer and Harris. Since it was clear that Dr. Sieber was no longer free to go about his business (remaining on the plane) and complied with the deputy(s) order to vacate the aircraft, this was the point of Dr. Sieber's formal detention.

The deputies describe the positions of the involved parties as the Sieber's were being escorted off the aircraft as Dep. Harris leading the group, first towards the flight deck, followed by Dr. Sieber, Mrs. Sieber and then Dep. Steer who was last.

Deputies Steer and Harris state that during the initial encounter with members of the flight crew and the Sieber's, neither deputy conducted any type of investigation as to why the crew wanted Dr. Sieber off the aircraft. The deputies concede that neither one interviewed any member of the flight crew; asked no probative questions; and obtained no evidence of any crime.

The deputies concede that neither one ever identified which member of the flight crew Dr. Sieber supposedly struck with a piece of his luggage; where on their body they may have been struck; nor did they ever identify the piece of luggage Dr. Sieber yielded when the alleged offense occurred. Both deputies concede that they were unable to identify any victim of any crime.

Deputy Steer concedes that even though he had listed flight attendant Weems as a "victim" in the short narrative paragraph of his incident report; she was not listed as a victim in the involved persons section of his report. He concedes that he could not in fact identify Weems, nor any member of the flight crew as a "victim" of any criminal offense.
Deputy Harris states that he was unable to hear any conversation(s) that Dep. Steer had with any member of the flight crew and only recalls Dep. Steer briefly speaking with Morales and Weems. Neither deputy state that they spoke with the pilot or co-pilot of the aircraft to attempt to determine the nature of any incident between the flight crew and Dr. Sieber. The deputies also concede that neither of them ever sought to interview any of the passengers to determine who had witnessed any incident between Dr. Sieber and the flight crew. They state that none of the passengers ever complained to that Dr. Sieber and/or his wife had been disruptive on the aircraft.

When asked, both Deputies Steer and Harris do not classify the incident between the Delta Airlines flight crew as being "civil" in nature. Yet, they concede that they were not investigating any criminal offense, even though Dep. Steer states that he was advised by flight attendant Weems that Dr. Sieber had either struck her or another unknown member of the flight crew with his carry-on bag. Dep. Steer only states that he and Dep. Harris "had been instructed" by the Delta flight crew to remove Dr. Sieber from the aircraft.

Deputy Harris states that as he was leading Dr. Sieber off the aircraft and that he and the doctor were near the open door to the flight deck, near the exit, Dr. Sieber attempted to ask the pilot a question. He states that this took place very quickly and he did not hear what Dr. Sieber attempted to ask the pilot.

Deputy Harris states that while near the flight deck, Dr. Sieber suddenly told him that he was not getting off the aircraft. He states that he told the doctor that he had to leave and at this point as he approached Dr. Sieber, the doctor "threw up a hand" in his direction.

Upon intensive questioning, Dep. Harris does not describe Dr. Sieber's hand gesture as being threatening, or assaultive. However, the deputy states that Dr. Sieber then "pushed" him back towards the open door to the flight deck. Dep. Harris states that the push caused him "to lose (his) balance." Dep. Steer states that he observed Dep. Harris to move backwards as if losing balance, but admits that his view of Dr. Sieber and Dep. Harris was obstructed by Mrs. Sieber's presence in the aisle.

Deputy Harris states that after being pushed by Dr. Sieber, he informed the physician that he would be arrested if he did not exit the aircraft. He states that he then physically escorted Dr. Sieber off the plane and onto the gangway. At this point, he and Dep. Steer told Dr. Sieber to place his hands behind his back so they could handcuff him. The deputies state that Dr. Sieber was briefly physically resistant to being handcuffed. The deputies state that they managed to handcuff and search Dr. Sieber and then escorted him to the Sheriff Department's office.

Deputies Steer and Harris state that upon arriving at the Sheriff Department's airport office, they placed the handcuffed Dr. Sieber into a locked cell. They concede that they did not remove the handcuffs even though the seventy-four year old physician had been searched, was no longer a threat and could not leave the secured environment of the locked cell. It is determined that Dr. Sieber remained in handcuffs, which he describes as tight and uncomfortable for over an hour.
The evidence documents that the visibly upset and crying Mrs. Sieber accompanied her elderly husband off of the aircraft and down to the Sheriff Department's office.

Plaintiff Dr. Sieber now claims that he had sustained injuries as a result of his arrest by the defendant officers. Dr. Sieber now brings forth a federal civil rights lawsuit against Delta Airlines, the Jefferson Parish Sheriff's Department and Deputies Jesse Steer and Erroll Harris for false arrest, excessive force, failure to intervene, excessive detention in handcuffs, failure to provide due process and deliberate indifference.

## ANALYSIS OF INCIDENT, POLICE PRACTICES AND LAW ENFORCEMENT ACTIONS TAKEN BY DEPUTIES STEER AND HARRIS

### EXPERT'S OPINIONS & FINDINGS

Finding & Opinion No. 1

<u>Defendant Deputies Jesse Steer and Erroll Harris's initial detention of plaintiff Dr. Sieber was inconsistent with the department and law enforcement education and training; as well as Louisiana and nationally recognized, accepted and applied codified law enforcement practices and standards of care</u>. The circumstances, statements, facts and forensic evidence that support this finding and opinion are as follows:

1. Peace officers receive training in the basic police academy and during periodic training in laws of arrest and search and seizure that they can stop and detain a citizen if they are aware of or observe specific articulable facts or circumstances that connect that citizen with suspicious or criminal activity.

2. Peace officers are taught that they can detain and arrest for any crime that they reasonably believe will occur, is occurring in their presence, or has occurred, depending upon the nature of that crime.

3. Peace officers in Louisiana are taught that they can affect the arrest for any misdemeanor or felony crime occurring in and outside their presence with "reasonable/probable" cause. "Reasonable or probable cause," is generally defined as specific, articulable circumstances, statements supported by facts that would cause a reasonable person to conclude that a crime has been committed.[1], [2]

4. Peace officers are taught that they can arrest individuals in obedience to a warrant.

5. Peace officers are trained that "reasonable suspicion" and "probable cause" are objective standards of proof.

6. Peace police officers are trained that they can base discretionary decisions relating to laws of arrest, search and seizure and the use of force in part upon their "collective knowledge" of professional education, training and experience. This collective knowledge extends to include all observations they make during their moment-by-moment encounter with subject(s) they are seeking to detain, investigate or arrest.

7. Peace officers are taught to make observations of behavior, circumstances, statements, facts and evidence that is both exculpatory and innocent in nature; or inculpatory and criminal in nature. Based upon these observations, an officer(s)' suspicions are either diminished or enhanced. When suspicions are enhanced, the totality of evidence might reach the standards of proof of reasonable suspicion to detain; or probable cause to arrest a subject who is a person of interest.

8. Deputies Steer and Harris state that they had graduated from an accredited Louisiana State Police Academy, but neither had ever attended an accredited Field Training Program where peace officers are tested for their competency in law enforcement practices in the field. Neither deputy recalls the last legal update in

---

[1] LA Crim. Code Proc. Art. §215.1A

[2] Case Law Ref. *Harrison v. State of LA*, LA Supreme Ct., #No. 97-C-1086 c/w No. 97-6-1125
*Rule 26b Report, Ron Martinelli, Ph.D.*
*Sieber v. Delta Air Lines, et. al, Case #USDC 2:17-CV-13024*

12

laws of arrest or search and seizure they had received as reserve deputies. (Deps. Dep. Steer and Harris)

9.  Dep. Steer states that he had only a two-three hour on-line training block of instruction on airport operations and how deputies should respond and handle calls for service at the airport. Dep. Harris states recalls no such training. Neither deputy recalls any of the Sheriff Department's airport Standard Operating Procedures (SOP's); nor where such policies/procedures might be found at the airport. (Deps. Dep. Steer and Harris)

10. Neither Dep. Steer nor Dep. Harris can accurately define what "subjective" and "objective" legal standards of proof are. (Deps. Dep. Steer and Harris)

11. Dep. Steer states that he does not know what the minimum legal standard of proof to detain a person is. Dep. Harris thinks the minimum standard of proof to detain someone is mere "suspicion." Dep. Steer states that the minimum standard of proof to affect an arrest is "probable cause." Dep. Harris states that he believes that the minimum standard of proof to affect an arrest is, "proof beyond a reasonable doubt." (Deps. Dep. Steer and Harris)

12. Both Deputies Steer and Harris agree that all crimes have criminal elements that need to be satisfied for a behavior/action to be considered as such. Dep. Steer agrees that absent evidence of the elements of any specific crime(s), there is no crime. Dep. Harris disagrees with this premise. Dep. Steer states that a deputy must have a complaining victim in order to satisfy the elements of any crime(s) not committed in the deputy's presence. (Deps. Dep. Steer and Harris)

13. Both Deputies Steer and Harris agree that deputies are taught to investigate crimes and that if someone complains about or alleges that a crime was committed, it is a deputy's obligation to investigate that crime(s). Both deputies agree that this is a recognized, accepted and applied law enforcement practice. Both deputies agree that the purpose of an investigation is a "search for the truth." (Deps. Dep. Steer and Harris)

14. Deputy Steer states that deputies must always investigate if they intend to take any law enforcement action(s). He states that whether or not law enforcement action(s) are taken depends upon the "totality of the circumstances." (Dep. Dep. Steer)

15. Deputy Steer agrees that just because a person alleges that a crime occurred does not necessarily mean that they are automatically classified as a "victim" in an investigation. (Dep. Dep. Steer)

16. Deputies Steer and Harris agree that deputies are trained in how to properly identify and classify reporting persons, witnesses, victims, persons of interest and suspects of crimes. They agree that the search for, identification and documentation of evidence is critical in every investigation. (Deps. Dep. Steer and Harris)

13

17. Deputies Steer and Harris agree that deputies are trained to reconcile or corroborate circumstances, facts and evidence to the statements of the involved persons. They agree that this is a very important component of every investigation and is a recognized, accepted and applied law enforcement practice. (Deps. Dep. Steer and Harris)

18. Deputies Steer and Harris state that they have been trained in how to accurately write incident reports. They agree that report writing is a critical component of any investigation and that this is a recognized, accepted and applied law enforcement practice. (Deps. Dep. Steer and Harris)

19. In the immediate case, the "collective knowledge" and facts that Deputies Steer and Harris relied upon to detain and arrest Dr. Sieber were as follows:

(a) Deputies Steer and Harris state that at the time of this incident, they received a call for service from the airport authority (AVCOM) about an irate passenger at Concourse D, Gate D-6. (Report, Dep. Steer, p. 3:1; Bates 0003; Dep. Steer; Dep. Harris)

(b) Deputies Steer and Harris responded to an aircraft (Delta Flight #696) which was parked at Gate D-6. Dep. Steer met with Delta Airlines flight attendant Dominic Morales and flight attendant Katherine Weems. Dep. Steer states that Wit. Morales advised him that the flight crew wanted the deputies to remove a passenger (Dr. Sieber) from the aircraft. (Report, Dep. Steer, p. 3:1; Bates 0003; Dep. Steer)

(c) Dep. Steer states that light attendant Weems told him either that she had been "struck" by a piece of "luggage" wielded by Dr. Sieber; or that she was reporting that another flight attendant had been struck by a piece of luggage wielded by the retired physician. (Report, Dep. Steer, p. 3:1, Bates 0003:1; Dep. Dep. Steer)[3]

(d) Dep. Steer states that flight attendant Weems told them that she had told Dr. Sieber to get off the plane and he had refused to do so. He states that he and Dep. Harris were "instructed" by the flight crew to remove Dr. Sieber from the aircraft. (Report, Dep. Steer, p. 3:1, Bates 0003:1; Dep. Dep. Steer)

(e) Dep. Steer states that he did not conduct a preliminary interview with flight attendant Weems, nor any other member of the flight crew including the pilots. Dep. Harris also did not interview any passengers on the aircraft to get additional information as to the circumstances involving Wit. Weems' allegations.

(f) Deputies Steer and Harris state that they did not identify any member of the flight crew or any passengers on the aircraft as witnessing any disagreement or encounter between the flight crew and Dr. Sieber.

[3] The deposition cites for Deputies Steer and Harris are not annotated by page/lines due to the lateness of their depositions and the court reporter not submitting deposition transcripts that were paginated and lined.
*Rule 26b Report, Ron Martinelli, Ph.D.*
*Sieber v. Delta Air Lines, et. al, Case #USDC 2:17-CV-13024*

(g) The deputies state that none of the passengers on the aircraft complained to them that Dr. Sieber and/or his wife had been creating a disturbance, or bothering any of the passengers on the aircraft prior to their arrival.

(h) The deputies concede that when they first observed and encountered Dr. and Mrs. Sieber, neither person was causing a disturbance on the aircraft and both were seated.

(i) The deputies concede that they had no information from Wit. Weems, the flight crew or passengers on the aircraft as to how Dr. Sieber may have struck anyone on the aircraft with a piece of luggage.

(j) Deputy Harris states that Dep. Steer was the primary deputy on the call, so he conducted no interviews, spoke to none of the flight crew or passengers and took no part in any investigation or collection of evidence that would provide exculpatory or inculpatory evidence of any criminal offense or civil incident between the flight crew and Dr. Sieber.

(k) When questioned, Dep. Harris states that it is not the objective of any investigation to determine whether there are any circumstances, statements, facts or evidence that would be exculpatory to a person of interest. He believes that the purpose of an investigation is strictly to determine evidence incriminating to a person of interest.

(l) Neither Deputies Steer nor Harris are able to define what objective versus subjective standards of proof are. Both deputies define the standards of proof for detentions and arrests of "reasonable suspicion" and "probable cause" as the same thing.

(m)    Deputy Steer concedes that he was not able to identify Wit. flight attendant Weems, nor any other member of the flight crew as a "victim," although he describes Weems as a "victim" in the brief narrative of his incident report. Wit. Weems' name does not appear in the "victim" location of Dep. Steer's report as one of the involved parties. Dep. Harris states that he reviewed Dep. Steer's incident report the day after the incident and does not know why Wit. Weems was not listed as a "victim" in the report. (Deps. Dep. Steer and Harris)

(n) Deputy Steer concedes that Wit. flight attendant Weems advised him that Dr. Sieber had allegedly struck her or another unidentified flight crew member with his luggage which would be seen as a potential criminal violation. He and Dep. Harris jointly refuse to classify the incident between the flight crew and Dr. Sieber as "civil" in nature. Dep. Steer's statements indicate that he intended to investigate the incident, but was unable to because the aircraft with the flight crew and passengers left before he could conduct an investigation.

15

(o) Both Deputies Steer and Harris agree that it is a recognized, accepted and applied law enforcement practice to conduct criminal investigations, including interviewing of victims, witnesses and persons of interest. Both deputies agree that it is also a recognized law enforcement practice to seek to identify and document evidence of crimes. Both deputies concede that neither attempted to do so.

(p) Deputy Steer's reasoning that the Delta flight left the airport and he had no time to conduct any investigation is not reasonable and inconsistent with his law enforcement training for several reasons:

(1) There was no exigency and the flight could have remained on the ground temporarily until a basic investigation including the interviewing of any victim, witnesses and Dr. Sieber and his wife could have taken place.

(2) Dep. Steer states that his interview with Wit. flight attendant Weems could not take place because their conversation would be overheard by others; yet, he admits that nothing prevented him from talking with Weems outside of the aircraft on the gangway.

(3) Two deputies had been assigned to this call. Dep. Harris could have easily stayed with Dr. Sieber while Dep. Steer interviewed a reporting person, any alleged victim, flight crew witnesses and passenger witnesses.

(4) Dep. Harris was over thirty years younger and outweighed the elderly physician by more than one hundred and fifty pounds. Dep. Harris was also armed with defensive weaponry and had special law enforcement training. Dep. Harris could have easily handled Dr. Sieber while Dep. Steer completed a basic investigation to determine the exact nature of their call for service.

(5) It is a trained and expected law enforcement and Sheriff's Department practice for deputies to conduct investigations of their calls for service.

(6) The information in Dep. Steer's incident report was incomplete, inaccurate and did not address any of the reason(s) for the initial call for service; nor any alleged criminal violation, or actions taken by Deputies Steer and Harris during this incident. For instance, Dep. Steer's report very specifically states,

*"Let it be known that Ms. Weems and Delta Airlines refused to pursue charges and issue statements."* (Report, Dep. Steer, p. 3:3; Bates 0003:3)

However, Dep. Steer now states that he wrote this statement in error, citing the fact that the Delta flight crew did not provide the deputies with any statements because the aircraft had already left the airport before he could investigate the incident and take their statements. (Dep. Dep. Steer)

16

(7) The conflicting nature of this call for service and incident necessitated a response by a supervisor to sort things out and determine a correct and reasonable course of action.

(q) There is no information or statements from the involved parties supporting any belief that exigent circumstances existed at the time which would have impaired or precluded the deputies from conducting a reasonable investigation to determine what if anything unusual transpired between the flight crew and Dr. Sieber that warranted his removal from the aircraft, a detention, or an arrest for any criminal violations.

(r) Deputies Steer and Harris state that they never considered whether Dr. Sieber had violated any federal transportation statutes before forcibly removing him from the aircraft. (Deps. Deps. Steer and Harris)

(s) Deputies Steer and Harris state that they never considered nor asked the Delta flight crew what if any Delta airline policies Dr. Sieber had violated before forcibly removing him from the aircraft. (Deps. Deps. Steer and Harris)

(t) Based upon my review of the discovery evidence and in consideration of my law enforcement education, training and experience, I make the following findings and opinions to a reasonable degree of professional certainty:

(1) In accordance with how peace officers are trained in Louisiana and nationally, Deputies Steer and Harris, lacked sufficient reasonable suspicion to detain Dr. Sieber for any criminal offense.

(2) The deputies' formal involuntary detention of Dr. Sieber occurred once the deputies directed Dr. Sieber to get out of his seat and exit the aircraft; and Dr. Sieber complied and began to move against his will towards the flight deck of the aircraft. Dr. Siebert's actions in response to the deputy(s) commands indicate that he believed that he was no longer free to remain in his seat and had to obey the instructions, directions, orders and commends of the deputy(s).

(3) The deputies had a legal, departmental, ethical and moral obligation to properly investigate the unknown incident and disagreement between the Delta Airlines flight crew and Dr. Sieber. However, they failed to do so.

(4) The defendant deputies failed to establish whether any criminal elements existed to support Wit. flight attendant Weem's allegation that Dr. Sieber had either struck her or any member of the flight crew with a piece of his carry-on luggage. This failure to investigate was contrary to their stated law enforcement training.

(5) The defendant deputies had a clear opportunity to identify a victim(s) and flight crew and/or passenger witnesses to the incident but failed to do so. This failure to investigate was contrary to their stated law enforcement training.

(6) The defendant deputies failed to identify and document any evidence supporting the statements of members of the Delta flight crew; specifically Wits. Flight attendants Weems and Morales. This failure to investigate was contrary to their stated law enforcement training.

(7) The deputies failed to identify any federal transportation regulations or statutes that Dr. Sieber had violated. In fact, the deputies testify that they never even considered that Dr. Sieber had even violated any federal laws. This failure to investigate was contrary to their stated law enforcement training.

(8) The deputies failed to identify any Delta Airlines policies that Dr. Sieber had violated, although they had ample opportunity to do so. This failure to investigate was contrary to their stated law enforcement training.

(9) In absence of any violations of state or federal laws; or any knowledge that Delta Airlines policies had been violated by Dr. or Mrs. Sieber; this incident was reduced to a low-level civil disagreement between the airline and the plaintiffs which could and should have been easily resolved by the deputies, but was not.

(10)    Deputies Steer and Harris were aware that plaintiffs Dr. and Mrs. Sieber were paying passengers on the Delta flight and had a right to due process while on the aircraft. Yet, they afforded the elderly couple no due process when they failed to reasonably investigate the circumstances of the disagreement between the private air carrier and the Sieber's. (Deps. Dep. Steer and Harris)

(11)    Deputies Steer and Harris demonstrated immediate and overt "confirmation bias"[4] against Dr. and Mrs. Sieber when they were advised by members of the Delta flight crew that the crew wanted the Sieber's off the aircraft. The deputies' testimony in itself is inculpatory since both deputies admit that they conducted no investigation to reconcile any aspects of the brief statement of Wit. flight attendant Weems that Dr. Sieber had "assaulted" anyone with his carry-on luggage.

(12)    The reason(s) provided by the defendant deputies as to why they did not conduct an investigation as required are irrelevant since there is no evidence of any exigent circumstances such as an imminent threat to passengers, the flight crew, or the deputies at the moment of detention. The deputies had no information that the aircraft was required to take off immediately and it was the flight crew who called for the assistance of deputies to remove Dr. Sieber.

---

[4] *Confirmation bias,* def., The tendency to interpret new evidence as confirmation of one's existing beliefs or theories.
*Rule 26b Report, Ron Martinelli, Ph.D.*
*Sieber v. Delta Air Lines, et. al, Case #USDC 2:17-CV-13024*

Additionally, the evidence documents that the two deputies were in adequate numbers, equipped and trained in officer safety tactics; and tactically had the "disparity of force" in numbers, age and weaponry to easily handle the elderly seventy-four year old retired physician.

(13)     Deputies Steer and Harris failed to use their tactical negotiation and de-escalation training in calming down and peacefully resolving the civil dispute between the airline carrier and the plaintiffs who were paying passengers. At no time did the deputies ever ask or obtain any information to determine the specific nature of the encounter between the flight crew and Dr. Sieber. This is despite the fact that the entire flight crew including pilots and passengers were present to assist in providing information to the deputies so that they could peacefully resolve the issue.

(14)     The evidence I have reviewed indicates that absent any reasonable investigation of a criminal or civil nature by the defendant deputies; coupled with the fact that Deputy Steer states that they were "instructed" by the Delta Airlines flight crew to summarily remove Dr. Sieber and perhaps his wife from the aircraft; the deputies actions in detaining and removing Dr. Sieber transitioned away from their discretionary duties as peace officers and turned the deputies into "agents" of Delta Airlines.

(15)     The actions of defendant Deputies Steer and Harris during their entire encounter with Dr. and Mrs. Sieber to the point of Dr. Sieber's involuntary detention were inconsistent with their department and law enforcement education, training and experience. Their actions fell below recognized, accepted and applied codified law enforcement practices and standards of care.

Findings & Opinion No. 2

Defendant Deputies Jesse Steer and Erroll Harris's detention of plaintiff Mina Margaretha Sieber-Schneiter was inconsistent with their department and law enforcement education and training as well as Louisiana and nationally recognized, accepted and applied codified law enforcement practices and standards of care. The circumstances, statements, facts and forensic evidence that support this finding and opinion are as follows:

1.  See Opinion No. 1 in its entirety.

2.  My finding and opinion is made within a reasonable degree of professional certainty.

3.  If it is determined by the Trier of Fact, that defendant Deputies Steer and/or Harris instructed plaintiff Mrs. Sieber to vacate the aircraft with her husband absent conducting any reasonable investigation; I would find and opine that the deputies' detention of Mrs. Sieber was inconsistent with the department and law enforcement education and training. I would further find and opine that Their actions fell below

19

state and nationally recognized, accepted and applied codified law enforcement practices and standards of care.

Findings & Opinion No. 3

Defendant Deputies Steer and Harris' actions in arresting plaintiff Dr. Sieber were inconsistent with their department and law enforcement education and training; as well as Louisiana and nationally recognized, accepted and applied codified law enforcement standards of care. The circumstances, statements, facts and evidence that support this finding and opinion are as follows:

1. See Finding & Opinion #1 in its entirety.

2. Defendant Deputies Steer and Harris state that they ultimately arrested plaintiff Dr. Sieber for "Resisting an Officer," (LA RS §14:108) and "Entry of remaining in places or on land after being forbidden," (LA RS §14.63.3). (Report, Dep. Steer, p. 1; Bates 0001; Deps. Deps. Steer and Harris). The deputies state that they did not arrest Dr. Sieber for assault/battery on a peace officer.

3. As previously discussed in Finding & Opinion No. 1, the deputies' detention of Dr. Sieber lacked specific, articulable statements, facts and circumstances consistent with the elements of any criminal violation of Louisiana State Statutes. The deputies concede that they never even considered whether Dr. Sieber had possibly violated any federal transportation laws or regulations. The deputies also concede that they never asked, nor were provided with any information from the Delta airlines flight crew as to what if any, specific Delta policies Dr. Sieber had violated to warrant him being forced of the aircraft.

4. Absent an investigation by the defendant deputies to attempt to reconcile the nature of their call for service of an "irate passenger" at Concourse D, Gate D on the Delta Airlines aircraft, the deputies merely were involved in a low-level civil argument between Dr. Sieber and the flight crew which they did not witness.

5. The deputies state that when they first observed Dr. Sieber, he was not irate and was calmly seated in his seat next to his wife. None of the passengers complained to the deputies that Dr. Sieber had been creating a disturbance or threatening anyone.

6. Upon initial observation, a reasonably trained peace officer deputy would not be able to reconcile Dr. Sieber's observable behavior with their call for service. This alone necessitated an investigation since Dr. Sieber was a paying customer who in the least had a right of due process through a preliminary investigation into the circumstances. As previously discussed this did not happen.

7. Since the law enforcement actions of Deputies Steer and Harris in involuntarily detaining plaintiff Dr. Sieber lacked the elements of reasonable suspicion; their detention of Dr. Sieber was inconsistent with the elements necessary to legally detain the plaintiff.

8. Deputy Harris states that Dr. Sieber was following him down the aisle to the flight deck to exit the aircraft. The deputy states that once Dr. Sieber reached the open door to flight operations where the pilot and co-pilot were working, Dr. Sieber attempted briefly to speak to the pilot who did not respond. Dep. Harris recalls that at this point Dr. Sieber suddenly "pushed" him which caused the deputy to momentarily lose his balance. Dep. Steer states that he did not witness Dr. Sieber have any physical contact with Dep. Harris, because his view was obstructed by Mrs. Sieber who was directly in front of him. He does state that he did see Dep. Harris move backwards of-balance. (Deps. Deps. Harris and Steer)

9. Deputy Harris states that after he was pushed by Dr. Sieber, he regained his balance and approached the physician. The deputy states that at this point, Dr. Sieber "*threw up a hand at me.*" Dep. Harris provides several descriptions of Dr. Sieber's hand movements. (Dep. Dep. Harris)

   "*He threw up his hands at me.*"
   "*His hand motions were as if he was; you know; resisting getting off the plane.*"
   "*(Dr. Sieber) took his right hand, like he was almost swatting me to get out of his way.*"

   Deputy Steer states that he did not witness any of these actions by Dr. Sieber. The deputy states that he quickly moved forward towards Dr. Sieber and Dep. Harris physically escorted the elderly physician off the aircraft. (Deps. Dep. Steer and Harris)

10. Deputies Steer and Harris state that they did not arrest Dr. Sieber for battery on an officer. (Deps. Deps. Steer and Harris)

11. The defendant deputies state that they ultimately placed Dr. Sieber under arrest for Resisting an Officer (LA RS §14:108); Entry/Remaining after Forbidden (LA RS §14:63.3) and Battery/Simple (LA RS §14:35). The charging status sheet from the Jefferson Parish District Attorney's Office documents that all three charges were refused by the District Attorney's Office on 01-13-17.

12. Based upon my review of the discovery evidence and in consideration of my law enforcement education, training and experience, I make the following findings and opinions to a reasonable degree of professional certainty:

   (1) The defendant deputies' initial detention of plaintiff Dr. Sieber was inconsistent with their department and law enforcement education and training; as well as Louisiana and nationally recognized, accepted and applied codified standards of care.

   (2) If the Trier of Fact determines that Dr. Sieber did not push Dep. Harris, I would find and opine that the deputies' arrest of the plaintiff was inconsistent with the law department and law enforcement education and training; as well as Louisiana and nationally codified law enforcement standards of care.

(3) If the Trier of Fact determines that Dr. Sieber did push Dep. Harris, I would the deputy's arrest of Dr. Sieber for "Resisting an Officer" to be valid.

(4) Based upon my review of the totality of the circumstances, I find and opine that the unreasonable law enforcement actions by defendant Deputies Steer and Harris in failing to explain to Dr. Sieber why he had to leave the aircraft; their failure to employ trained verbal de-escalation techniques; their failure to reasonably investigate the criminal allegations and civil issues of this confrontation between the flight crew and Dr. Sieber; and their actions as agents of Delta Airlines and failure to provide the plaintiff with due process significantly contributed to Dr. Sieber's delay in exiting the aircraft.

(5) Based upon my review of the totality of the circumstances, I find and opine that insufficient information and evidence existed, including a faulty and unreasonable investigation, for any reasonably trained deputy peace officer to conclude that Delta Airlines had a lawful right to force Dr. Sieber and his wife off the aircraft.

<u>Finding & Opinion No. 4</u>

<u>Defendant Deputies Steer's and Harris' actions in the manner in which they physically restrained and handcuffed plaintiff Dr. Sieber were inconsistent with their law enforcement education, training, experience, department policy and law enforcement standards of care</u>. The circumstances, statements, facts and evidence that support this finding and opinion are as follows:

(1) Peace officers in the State of Louisiana and nationally are trained in the proper application of force under state and federal guidelines. These codified legal and training guidelines provide the basis for an officer's calculus of force. [5]

(2) Peace officers are taught in the police academy and in periodic department training that they can use whatever force is objectively reasonable to affect an arrest, prevent escape, and/or overcome a suspect's resistance. (Graham v. Connor)

(3) Peace officers are taught that they need not necessarily use the least intrusive level of force when attempting to control a resisting subject or in effecting an arrest. Again, they learn that whatever level(s) of force they use must be objectively reasonable. (Graham v. Connor)

(4) Peace officers are taught that the justification for the use of force is limited to what is known or perceived by the officer(s) "at the time." Facts discovered after the event, no matter how compelling, cannot be considered in determining whether the force used was justified or not. (Graham v. Connor)

---

[5] Graham v. Connor, 490 U.S. 386, 396-97, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989)

(5) Peace officers are taught that when considering non-force or forceful responses to a subject's resistance they must balance the "government need" against the "intrusion upon the individual." (Graham v. Connor)

(6) Peace officers are taught that they may sometimes make detention, arrest and force decisions based upon information that is later shown to be imperfect and/or inaccurate. Since officers have specialized training and experience, and because they face extraordinary risks, they are provided certain latitudes in their calculus of the need for force. (Graham v. Connor)

(7) Peace officers are taught that the "reasonableness" of a use of force must be judged from the perspective of a similarly trained, reasonable officer on the scene, and their understanding of the "totality of circumstances." An officer's calculus in their decision to use force includes the emergent nature of the circumstances and the need to use a certain quantum of force during rapidly developing events or occurrences, as compared to a review of events in hindsight. (Graham v. Connor)

(8) Peace officers in Louisiana are justified to use any level(s) of force that they reasonably believe, in consideration of the "totality of circumstances," is necessary to defend either themselves or another person from bodily harm. (Graham v. Connor)

(9) When analyzing, discussing and rendering opinions in any case involving the application of force, the issue of whether the circumstances of the event was rapidly evolving and/or tense and uncertain is important. In the immediate case, I have determined that the event was not rapidly evolving, tense, uncertain, or in any way dangerous for the defendant officers.

(10) <u>No Exigent circumstances</u> – There is no evidence that any exigent circumstances existed that threatened the safety or security of the flight crew or passengers on board the aircraft prior to or during the defendant deputies' encounter with Dr. Sieber and his wife.

(11) Peace officers are taught in the academy and during department update use of force training that prior to the deployment of force, when they are considering which force option(s) to select, they must consider all the circumstances confronting them, including the following: [6], [7]

   1. The seriousness of the event.
   2. Does the subject pose a physical threat to the officer(s), or a 3rd person(s).
   3. What level of resistance is the subject using against the officer(s).
   4. Whether the subject is attempting to flee and evade capture.

(12) Peace officers are taught in their training classes that the deployment of force must conform with federal *Graham v. Connor* standards. They are taught that there

---

[6] Graham v. Connor, 490 U.S. 386, 396-97, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989)
[7] Case Cite, Glenn v. Washington, 673 F.3d 864, 871 (9th Cir. 2011)
*Rule 26b Report, Ron Martinelli, Ph.D.*
*Sieber v. Delta Air Lines, et. al, Case #USDC 2:17-CV-13024*

are many more circumstances to consider in their calculus as to whether to use force and what level than have been discussed in *Graham*. Among these are that every police encounter with a citizen is unique with its own challenges that may preclude or obstruct an officer from using less intrusive methods of capture.

What the Federal Courts in *Graham* refer to as the *"totality of circumstances"* include but are not limited to: the officer(s') collective knowledge, seriousness of event, threat posed, level of resistance, information available to the officer(s) at the time, the general environment and other factors, obstructions, and the officer(s) ability to see whether the subjects are armed, ability to communicate with other officers and resources, nature of the subject(s)' attempt to evade capture, etc. [8]

(13)   Seriousness of the incident and threat posed by Dr. Sieber –

(a) Based on the statements, facts, and forensic evidence I have reviewed, Deputies Steer and Harris were involved in a simple civil dispute between one or more members of the flight crew or an off-airplane operations manager. Therefore, there was no threat nor danger to any of the flight crew, or passengers aboard the aircraft.

(b) In the moments immediately preceding the deputies' encounter with Dr. Sieber, the deputies were advised or were personally aware that:

1. They were responding to a call from the airport authority (AVCOM) regarding an "irate passenger" at Concourse D, Gate D-6 on Delta Airlines Flight #696. (Report. Dep. Steer, p. 3:1; Bates 003)

2. Flight Agent (flight crew attendant) Katherine Weems advised them that Dr. Sieber struck her or another flight attendant about the upper body with a piece of luggage and was refusing to de-board the plane. (Report. Dep. Steer, p. 3:1; Bates 003)

3. Deputies Steer and Harris concede that upon arrival inside the aircraft, they did not observe Dr. Sieber to be disruptive and that the plaintiff and his wife were sitting in their seats.

4. The deputies concede that no other members of the flight crew, nor any of the passengers approached them to complain about Dr. Sieber.

5. Dr. Sieber was an elderly, retired physician weighing approximately one hundred-seventy pounds who posed no imminent threat to anyone on the aircraft.

6. The deputies were not able to reconcile anything that Wit. flight attendant Weems of Wit. Morales said with respect to Dr. Sieber's alleged behavior.

7. Dep. Harris states that Dr. Sieber suddenly pushed him while both were on the flight deck in front of the open flight operations doorway. The alleged

push and any alleged hand movements by Dr. Sieber were not observed by Dep. Steer.

8.  Deputies Steer and Harris state that they asked Dr. Sieber to place his hands behind his back to be handcuffed. They indicate that the plaintiff was briefly passively resistant to being handcuffed. The deputies searched Dr. Sieber for weapons and found none.

9.  Dr. Sieber states that once outside of the aircraft, one of the deputies pushed him harshly up against the wall of the gangway and verbally threatened "to teach (him) a lesson." The plaintiff denies being physically resistive during handcuffing. Both deputies deny pushing the plaintiff up against a wall or threatening him. (Dep. Dr. Sieber, pp. 88:17-25; 89:4-10; Deps. Deps. Steer and Harris)

10.  Deputies Steer and Harris escorted the handcuffed Dr. Sieber to the Sheriff Department's office. They then placed him still handcuffed into a locked and secured cell.

11.  Deputies Steer and Harris state that they did not remove Dr. Sieber's handcuffs for well over an hour. They concede that Dr. Sieber posed no threat to them and was contained in a locked and secured cell. Dr. Sieber states that the deputies left him in the cell and in tight handcuffs for one and a half hours. The plaintiff claims that he was injured by the tight handcuffs. (Dep. Dr. Sieber, p. 90:10-17; Deps. Deps. Steer and Harris)

12.  Based upon my review of the evidence in this case and in consideration of my law enforcement education, training and experience, I find and opine to a reasonable degree of professional certainty that:

(1)  The length of time that the defendant deputies kept Dr. Sieber restrained in handcuffs was unreasonable and inconsistent with recognized, accepted and applied codified law enforcement practices and standard of care in Louisiana and nationally because:

- Dr. Sieber had been arrested for resisting/delaying an officer which is a low-level misdemeanor offense.

- Dr. Sieber never verbally threatened the officers, flight crew or passengers on the aircraft.

- No one witnessed Dr. Sieber allegedly "pushing" Dep. Harris, as opposed to the obese deputy simply losing his balance on the flight deck.[9]

---

[9] Obesity – Body Mass Index, https://www.cdc.gov/obesity/adult/defining.html
**Body Mass Index** (BMI) is a person's weight in kilograms divided by the square of height in meters. ... If your BMI is 18.5 to <25, it falls within the normal. If your BMI is 25.0 to <30, it falls within the overweight range. If your BMI is 30.0 or higher, it falls within the **obese** range. Deputy Harris' BMI at 5'-10" and 325 lbs. was measured at 46.6 BMI, therefore, he was extremely obese.

- After handcuffing Dr. Sieber, the deputies had searched him and found no weapons on his person.

- Dr. Sieber was placed into a completely secure and locked cell and was not a physical threat to anyone.

- Dr. Sieber was seventy-four years old and elderly. The placement of mechanical restraints on the thin skin of the elderly has been known to cause both unnecessary pain and injury.

- Dep. Harris states that it was simply his discretion not to uncuff Dr. Sieber, which is inconsistent with the deputy's law enforcement training, the Graham Standard and recognized, accepted, trained and applied professional police practices.

My findings and opinions are based upon my initial review of the listed documents as provided to me at this time. I will alter, amend, enhance or delete my findings and opinions as necessary following my review of any additional discovery in this case.

I would so testify to my findings and opinions under penalty of perjury if called upon in any subsequent legal proceedings.

Signed _____ Date: August 12, 2019

    Ron Martinelli, Ph.D., CMI-V

    Forensic Criminologist/Law Enforcement Training Consultant

    Federal/State Courts Qualified Law Enforcement Practices Expert

    Certified Medical Investigator