# EXHIBIT 2



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CIVIL ACTION NO. 2:17-cv-13024

DR. JOHANNES MARKUS SIEBER and
MINA MARGARETHA A SIEBER SCHNEITER

Plaintiffs

v

DELTA AIR LINES, INC., DELTA FLIGHT AGENT KATHERINE WEEMS, DELTA HEAD FLIGHT AGENT JANE DOE, THE JEFFERSON PARISH SHERIFF JOSEPH P. LOPINTO, III, SHERIFF'S DEPUTY JESSE SETEER AND SHERIFF'S DEPUTY HARRIS

Defendants

## REPORT OF
## LINDA K FOW-MESNARD
## DATED AUGUST 2019

| | |
|---|---|
| **On instruction of:** | Jackson Law International<br>1201 S Orlando Avenue, Suite 201<br>Winter Park<br>Florida 32789 |
| **On behalf of:** | Plaintiffs |
| **Specialist field:** | Aviation – Cabin services |
| **Subject matter:** | Report on Incident Aboard Delta Air Lines Flight No. 696, November 21, 2016. |

GMR Aviation Consulting
2255 Glades Road
Suite 324A
Boca Raton, Florida 33431
Tel: 561 988 8717
Email: info@gmrconsulting.com

Report of:       Linda Fow-Mesnard
Specialist field: Aviation
On behalf of:    Plaintiffs
Dated:           August 2019

**CONTENTS**

| SECTION NO. | ITEM | PAGE |
|---|---|---|
| 1. | Introduction | 3 |
| 2. | Instructions | 3 |
| 3. | Documents disclosed/reviewed | 3 |
| 4. | Report headings | 4 |
| 5. | Professional experience | 4 |
| 6. | Relevant experience | 6 |
| 7. | Background | 7 |
| 8. | Executive summary | 9 |
| 9. | Analysis of Flight Attendant actions towards the customer according to my knowledge of Delta Air Lines Customer Misconduct policy and procedures | 10 |
| 10. | Conclusion | 12 |
| 11. | Glossary of technical terms | 12 |
| 12. | Appendices | 13 |

| Report of: | Linda Fow-Mesnard |
|---|---|
| Specialist field: | Aviation |
| On behalf of: | Plaintiffs |
| Dated: | August 2019 |

REPORT

1. **INTRODUCTION**

1.1 My name is Linda Fow-Mesnard and I am an Aviation Consultant for GMR Aviation Consulting LLC. The Company's address is 2255 Glades Road, Boca Raton, Florida 33431.

1.2 A copy of my Resume, which includes my qualifications, is set out in Appendix 1. I confirm that I have been not been deposed or given evidence at a trial in the United States in the past four years and have not authored any publications in the past ten years.

1.3 My services are provided through GMR Consulting LLC. Fees are $320 per hour plus expenses for reviewing all materials, preparing this report and any deposition/trial time. Invoices rendered to date are attached as Appendix 2.

2. **INSTRUCTIONS**

2.1 I have been retained by Jackson Law International to prepare an aviation report in the case of Dr. Johannes Markus Sieber and Mina Margaretha Sieber Schneiter (Plaintiffs) vs. Delta Air Lines, Inc., Delta Fight Agent Katherine Weems, Delta Head Flight Agent Jane Joe, the Jefferson Parish Sheriff Joseph P. Lopinto, III, Sheriff's Deputy Jesse Steer, and Sheriff's Deputy Harris, (Defendants).

2.2 My specific instructions are:

2.2.1 To provide my opinion, based on my training and experience as a Flight Attendant and In-Flight Service Manager for 32 years, as to whether the Flight Attendants in this incident complied with Delta Air Lines Customer Misconduct policy and procedures.

3. **DOCUMENTS DISCLOSED/REVIEWED**

3.1 I have set out in section 12 a complete list of all the documents disclosed and reviewed while preparing this report.

Report of:        Linda Fow-Mesnard
Specialist field: Aviation
On behalf of:     Plaintiffs
Dated:            August 2019

## 4. REPORT HEADINGS

My report is set out under the following key headings:

4.1 A description of my professional experience and its relevance to the issues which I deal with in this report;

4.2 The background regarding this claim;

4.3 An executive summary;

4.4 Customer Misconduct – Delta In-Flight Service & Flight Attendant Procedures;

4.5 My conclusions.

## 5. PROFESSIONAL EXPERIENCE

5.1 My aviation experience began with Western Airlines in May 1981. I began my career as a Flight Attendant based in Minneapolis, Salt Lake City, San Francisco and Los Angles. I was trained to staff all onboard crew positions (leader, galley, regular) and aircraft emergency procedures on the B737-200, B727-200 and DC-10. I flew in domestic and international theatres.

5.2 In April of 1987, Delta Air Lines purchased Western Airlines and I was offered continued employment at the time of the merger. I began training aircraft emergency procedures on the B737-300, B757-200 and-300, DC-9, B767-200, B767-300, B777 and L1011-500. I was trained to staff all onboard crew positions, including Purser-International. My career as a Flight Attendant continued in the Los Angeles, Miami, Atlanta, New York, and Orlando bases. I was promoted in August 1999 to In-flight Service Health, Safety and Security Specialist of the Southeast Region.

5.3 My general responsibilities as the In-flight Health, Safety, and Security Specialist were to support our Region's Managers and Flight Attendants on various topics related to in-flight safety. For Flight Attendants I hired vendors to participate in Health Fairs and Safety Forums where Flight Attendants learned ergonomic techniques for On-the-Job injury prevention. I was also responsible for evaluating their demonstration of proficiency of onboard safety equipment by scheduling and proctoring safety exams. In 1999-2000, I collaborated with Corporate Safety on

addressing decibel levels on the B737-200, with Industrial Hygiene engineers on HEPA (see glossary) filtration in older aircraft and beverage cart re-design. To our regional In-flight Managers, I provided statistical safety trend and injury analyses, such as employee time loss due to injury, costs of employee time and recovery loss due to onboard injuries. The result of this work established solid working partnerships with managers and vendors to improve service to injured employees. I remained in this management-level position until November 2001, when I was promoted to In-flight Manager in the Southeast Region, in domestic and international theatres.

5.4 My role as an In-flight Manager was as a supervisor of Flight Attendants in both operational and employee relations. Specifically, I worked as part of an operational supervisory team and concurrently had up to 350 Flight Attendants as direct reports.

5.5 My specific responsibilities in operations were to attend and participate in crew briefings, address crew appearance, ensure Flight Attendants were onboard their aircraft in a timely fashion, locate support for any onboard catering/supply shortfalls, partner and resolve any Customer Service issues and ensure an on-time departure.

5.6 My specific responsibilities in employee relations were to support Flight Attendants who had work-related issues and injuries, address absence trends, discuss customer and crewmember compliments and complaints, address safety and/or security compliance, scheduling issues and introduce new customer service and safety procedures. I also provided subject matter expertise in pay, benefits, support programs, uniform programs, work rules and policy questions.

5.7 During my career as a Manager I participated in many progressive and forward-thinking programs. I trained in advanced manager communication techniques, resulting in being a member of a high level management communications team and serving on the Conflict Resolution Board for the In-flight Service Department.

5.8 I also trained to be a member of the Delta Cares team. This team is deployed to an aircraft accident location to support families of passengers and employees, in partnership with their Corporate Go-teams.

5.9 I was rated number one Manager in the In-flight department by my employees and was in the position until retirement from the airline in December of 2012.

5.10 I completed a Masters in Public Administration in 2006 and earned Professional Human Resource certification by the Human Resource Management Institute in 2008.

5.11 I became a Florida Supreme Court Certified County Mediator in 2010. Upon receiving certification as a County Mediator, I was invited to join the Brevard County Mediation Program in the Eighteenth Judicial Circuit of Florida as a Volunteer Mediator.

5.12 I have also been trained in Circuit and Dependency mediation, and received certification as a Dependency Mediator in September of 2016. Upon receiving certification as a Dependency Mediator, I accepted a contract with the Eighteenth Judicial Circuit as a Dependency Mediator.

5.13 In February of 2014 I accepted a position as Mediation Program Analyst with the Eighteenth Judicial Circuit – Brevard County. I continue to be employed by the State of Florida in this position.

## 6. RELEVANT EXPERIENCE

6.1 During the years of my aviation career, I encountered numerous customer service issues. When a Flight Attendant is involved in a customer service issue, there is a level of professionalism expected. Each Flight Attendant is trained by the Company regarding proper handling of such situations. I was trained in handling customer service issues onboard aircraft in Initial (new-hire) Training and during numerous required customer service technique classes over the span of my 30+ years.

6.2 I have directly handled Passenger Disturbance incidents ranging from very basic investigation of crew members and customers involved in verbal disagreements, to crew members or customers being struck by luggage.

    6.2.1 Experience as a Flight Attendant: During the boarding process when passengers had disagreements, I would station myself in the aircraft aisle, witness the event, then approach the situation to assess and engage with each customer in order to discover the source of conflict. Using listening and conflict resolution skills learned in training over my career, I would diffuse the situation with the tools and options available. Examples of this include: relocating passengers to different seats or offer compensations available in-flight. As with any irregularity onboard the aircraft, I would always alert all crew members of the incident including the

cockpit crew, regarding the passengers' disagreement, new seat assignments, and how the issue was resolved. The event would then be documented in the In-Flight Service Safety Reporting system as per proper company protocol.

6.2.2 In over 30 years of experience, due to proper use of conflict resolution tools offered by Delta Air Lines during Initial Training as well as annual trainings, as a Delta flight attendant I have never been involved in a situation where a customer resisted to be removed from the aircraft.

6.2.3 In over 30 years of experience, due to proper use of conflict resolution tools offered by Delta Air Lines during Initial Training as well as annual trainings, as a manager in Operations I have been involved in situations where a customer voluntarily left the aircraft after professional and amicable conversations took place.

6.2.4 Experience as an In-flight Supervisor and Manager: I have been involved in pre-departure dispute resolution to assist in handling crew conflict, passenger and crewmember conflict, passenger injury and illness, Flight Attendant injury and illness.

6.3 Relevant to this case, I have been trained in handling passenger disturbance incidents onboard both domestic and international flights as a Flight Attendant, Lead Flight Attendant (domestic), Pursor (International), and in the capacity of a Flight Attendant Operations Manager called to assist in conflict resolution between Flight Attendants and passengers.

## 7. BACKGROUND

7.1 Prior to being assigned this case, I have never met nor had knowledge of either Dr. Johannes Markus Sieber nor Mina Margaretha Sieber Schneiter. I was an employee of Delta Air Lines, Inc. from May 1981 to December 2012.

7.2 It is for the fact-finder to resolve any disputed facts of the case. Based on the information disclosed to date, I understand the facts to be as follows:

7.3 According to Dr. Sieber's letter to Delta Air Lines, Dr. Sieber boarded Delta Air Lines Flight No. 696 on November 21, 2016 with his wife, both found

the way to their seats and began to stow their carry-on luggage. Dr. Sieber encountered difficulty stowing their luggage when two things occurred; the overhead bin above his seat was already full, and another overhead bin beyond his seat had various items in it, including a large plastic bag filled with individually packaged blankets for customer use. Upon shuffling items around to properly stow his luggage, the individually packaged blankets fell out of the overhead bin, in and around nearby seated passengers.

7.4  According to Dr. Sieber's letter, a Flight Attendant standing in the aircraft aisle, observed Dr. Sieber struggling to stow his luggage while attempting to capture falling blankets. The Flight Attendant rushed to the back of the aircraft in order to call Lead Flight Attendant Katherine Weems who was stationed in the front of the aircraft. Meanwhile, after Dr. Sieber had successfully stowed his bag and picked up all the blankets placing them back into the overhead bin, he took his seat.

7.5  According to Deputy Steer's deposition, it was reported to him by their dispatch office of an irate customer onboard Delta 696, and to meet the crew at the aircraft.

7.6  According to Deputy Steer's deposition, it was reported to him by a Flight Attendant onboard the aircraft that either she or one of the other Flight Attendants was struck by a customer's luggage, and they "want him off the airplane".

7.7  According to Dr. Sieber's letter, Dr. Sieber was approached by a flight attendant.

7.8  According to Deputy Steer's deposition, when he reported to the aircraft he was instructed to remove a customer from the aircraft, and was directed to Flight Attendant Weems. The customer was pointed out by crew to be Dr. Sieber.

7.9  According to documents provided to me, Flight Attendant Weems instructed Deputy Steer that she had been struck by a customer's luggage and pointed out the customer to Deputy Steer.

7.10 According to both depositions of Deputy Steer and Deputy Harris, the customer that was allegedly irate had to be pointed out to them by the flight attendant  The customer they pointed out was not irate, and was sitting quietly without complaint from other customers.

7.11  According to documents provided to me, the criminal charges against Dr. Sieber were refused by the District Attorney.

7.12  According to Dr. Sieber's letter, Dr. Sieber repeatedly asked why he was being removed. He was not told a reason by any Delta crew member. Once off the aircraft, Dr. Sieber was arrested, handcuffed, and transported to jail.

7.13  According to Dr. Sieber's letter, Dr. Sieber was released from jail. He went to the airport to complete his travels to New York. The ticket agent at the Delta counter told him he was banned from flying on Delta. The ticket agent gave him customer service contact information for assistance in making a flight reservation on Delta. Dr. Sieber stated in his letter that he went to American Airlines to book travel to New York.

7.13  In Dr. Sieber's letter he stated a few days after the incident, he wrote a letter to Delta Air Lines asking for reimbursement of the airfare for the flight he was removed from, and additional costs as a result of being arrested and jailed.

7.14  According to a letter from Delta's Customer Care Department dated December 15, 2016, the representative from Delta stated, "[I] will submit a refund of your unused ticket".

7.15  According to a letter from Delta's Customer Care Department the representative stated "It has been documented by our In-Flight crew that law enforcement boarded the aircraft to remove both you and your wife." The letter continues to state, "it seems our Flight Attendant felt threatened by your actions, and at that point we have to take security precautions. With that being said, I regrettably decline your request for reimbursement of any out of pocket expenses or pre-paid plans."

8. **EXECUTIVE SUMMARY**

8.1  It is my opinion the Delta Flight Attendants and Operations Service manager failed to follow the Delta Customer Misconduct policy and procedure because they failed to assemble the complete security team which resulted in an incomplete assessment of Dr. Sieber's conduct.

8.2 There is no documentation that any Delta employee attempted any professional and amicable conversations between the Delta personnel assembled and the customer at any time.

8.3 It is my opinion that this incident did not qualify for the involuntary removal of Dr. Sieber from the aircraft, because there was no opportunity for resolution and no injury to the Flight Attendant.

8.4 Based on the review of the documents provided, it is my opinion and experience there was a complete failure of Customer Misconduct protocol because a customer would never be removed from an aircraft without the Captain being involved in that decision.

8.5 It is my opinion that the failure of a crewmember to provide a report or statement of a Customer Misconduct event is not in compliance with Delta company policy.

8.6 It is my opinion that it is contrary to Delta policies and procedures that a customer would be banned from future flights with Delta by only verbal notification, and without a formal process involving statements from the crew and the customer.

9. **ANALYSIS OF FLIGHT ATTENDANT ACTIONS TOWARDS THE CUSTOMER ACCORDING TO MY KNOWLEDGE OF DELTA AIR LINES PASSENGER DISTURBANCE POLICY AND PROCEDURES**

9.1 It should be noted that as the Delta Air Lines In-Flight Service OnBoard Manual was not disclosed to me, but I do have knowledge of this manual and used this manual throughout my career. I have evaluated the incident on Delta Air Lines Flight No. 696, on November 21, 2016 using my experience and training, as detailed in sections five and six above. This experience encompasses, but is not limited to, the following:

9.1.1 As a Delta Flight Attendant I was trained to evaluate behaviors of customers onboard the aircraft for the utmost comfort and safety of passengers, crew, and aircraft.

9.1.2 As a Delta Flight Attendant I was trained to provide excellent customer service and observe customer behaviors simultaneously, especially during the boarding process.

9.1.3 As a Delta Flight Attendant I was trained in Customer Misconduct. There are specific levels of misconduct and each

Level defines behaviors of the customer. Those behaviors are applied to each definition with corresponding actions by the Flight Attendant. It is my opinion that this incident could be considered, at most, a Level 1.

9.1.4 As a Delta Flight Attendant I was trained in Customer Misconduct and there are non-confrontational communication skills and de-escalation tools to incorporate when facing a customer with unacceptable customer behavior.

9.2 It is my experience as a Delta Flight Attendant having been trained in Customer Misconduct, that when there is Customer Misconduct issue onboard an aircraft, there must be a conference of crew (Flight Attendants and pilots), gate agents, and managers in the Operations Control Center in Atlanta. The purpose of the meeting is to verify the actions of the customer, to validate the appropriate Level of threat (there are four Levels), and to follow protocol to an amicable resolution according the chosen Level.

9.3 It is my opinion there would be an expectation of communication from the Flight Attendant to Dr. Sieber if the flight attendant felt Dr. Sieber was verbally or physically aggressive or she had been struck by his luggage. In this case based on the documents provided, the Flight Attendant standing nearby observed and did not assist Dr. Sieber with stowing his luggage.

9.4 From my training, I would expect there to be a private conversation between the Flight Attendant alleged to have been struck by the luggage, the Lead Flight Attendant, the Captain, and the alleged customer at fault. In this case based on the documents provided, Dr. Sieber was not aware, nor told, that he had struck the Flight Attendant with his luggage.

9.5 It is my opinion based on the documents provided, there was no attempt by any Delta Flight Attendant, pilot or gate agent to de-escalate the situation.

9.6 Further, I have seen no evidence that any Delta crewmember notified Dr. Sieber that his actions onboard the aircraft were inappropriate, or the consequences of his alleged misconduct.

9.7 It is my opinion that if all parties involved work together toward a positive resolution, such as giving the passenger the opportunity to explain his

actions if or to make an apology if he was made aware his luggage had make contact with the Flight Attendant

9.8 It appears from the documents disclosed that Dr. Sieber only experienced confrontational communications from the Delta staff.

9.9 In my experience I would expect there to have been a statement of the incident from the Flight Attendant allegedly struck by Dr. Sieber's luggage in the Delta In-Flight Service Reporting System. There should also have been a statement from the Lead Flight Attendant. According to the letter Dr. Sieber received from Delta's Customer Care Department these statements exist but they have not been disclosed to me.

9.10 I would also expect to see witness statements collected by the Lead Flight Attendant from customers who witnessed the alleged battery.

9.11 In my view when Dr. Sieber asked why he was being removed from the aircraft, he reasonably would expect to be informed by the Flight Attendant, or pilot (if involved). According to documents provided to me, Dr. Sieber was not told by a crew member of any violation of Delta policy.

9.12 In my experience, as set out in 9.2 above, the decision to involuntarily remove a customer from the aircraft should not be an autonomous decision.

## 10. CONCLUSION

10.1 Based on all the evidence provided to me to date and on my professional experience and training (as set out in sections five and six above), it is my opinion that the Flight Attendants on Delta Flight 696, on November 21, 2016 failed to properly evaluate Dr. Sieber's behavior given the training they would have undertaken.

10.2 Additionally, it is my opinion based on my experience, that they did not take appropriate action to de-escalate the situation, nor did they communicate to Dr. Sieber the likely consequences of his actions.

10.3 From the documents disclosed to me, I cannot confirm that a meeting of crew (Flight Attendants and pilots), gate agents, and managers in the Operations Control Center in Atlanta took place. The purpose of this meeting would be to collectively discuss the decision to have Dr. Sieber removed from the aircraft – which is Delta's protocol.

10.4 My report relies upon my own analysis of documents disclosed, as listed in section 12. However, I reserve the right to amend my report in the light of any additional evidence which may become available.

## 11. GLOSSARY OF TECHNICAL TERMS

**HEPA**
An acronym for High Efficiency Particulate Arrestance.

**OCC**
An acronym for Delta's Operations Control Center

Respectfully submitted,

Signature: _____

Date: 12 August 2019

Linda Fow-Mesnard
GMR Consulting

## 12. APPENDIX

1. Linda Fow-Mesnard, Resume

**List of documents reviewed and considered;**

1. Plaintiffs' Initial Disclosures
2. Plaintiffs' Responses to Delta's First Set of Interrogatories
3. Plaintiffs' Responses to Delta's First Request for Admission
4. Plaintiffs' Responses to Delta's First Request for Production

|     | Report of: | Linda Fow-Mesnard |
| --- | --- | --- |
|     | Specialist field: | Aviation |
|     | On behalf of: | Plaintiffs |
|     | Dated: | August 2019 |

5. Plaintiffs' Production (Bates No. 001-049)
6. Delta's & Katherine Weems' Initial Disclosures
7. Delta's & Katherine Weems' Supplemental & Amended Initial Disclosures
8. Delta's Supplemental & Amended Initial Disclosures
9. Delta's Second Supplemental & Amended Initial Disclosures
10. Delta's Third Supplemental & Amended Initial Disclosures
11. Delta's Responses to Plaintiff's First Set of Interrogatories
12. Delta's Amended Responses to Plaintiff's First Set of Interrogatories
13. Delta's Second Amended Responses to Plaintiff's First Set of Interrogatories
14. Katherine Weems' Responses to Plaintiff's First Set of Interrogatories
15. Katherine Weems' Amended Responses to Plaintiff's First Set of Interrogatories
16. Katherine Weems' Second Amended Responses to Plaintiff's First Set of Interrogatories
17. Katherine Weems' Supplemental Responses to Plaintiff's Interrogatory Number 4
18. JPSO Initial Disclosures
19. JPSO Supplemental Disclosures
20. JPSO Second Supplemental Disclosures
21. Letter from Dr. Sieber to Delta Air Lines
22. Electronic mail from Delta Air Lines to Dr. Sieber
23. Second Amended Complaint
24. Deposition Transcript of Dr. Sieber Taken on July 11, 2019
25. American Airlines Ticket for Flight on November 22, 2016
26. Delta's "Need Help" Card
27. Letter from Dr. Sieber to Louisiana Inspector General
28. Letter from Dr. Sieber to New Orleans Airport
29. Letter from District Attorney, 24th Judicial District, Parrish of Jefferson, State of Louisiana, refusing charges against Dr. Seiber